# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RYAN DEXTER WILSON,

        Plaintiff,

v.                                              Case No.  3:17-cv-644-J-34JRK

BILL LEEPER, in his official capacity as
Sheriff of the Nassau County Sheriff's
Office, a Law Enforcement Agency of
the State of Florida,

        Defendant.

_____

# O R D E R

**THIS CAUSE** is before the Court on the Defendant's Dispositive Motion for Summary Judgment (Doc. 24, Motion).  On July 3, 2017, Plaintiff, Ryan Dexter Wilson, filed an Amended Complaint against Defendant, Bill Leeper, in his official capacity as Sheriff of the Nassau County Sheriff's Office, alleging federal and state claims arising out of Wilson's arrest and detention for arson and burglary.  See Doc. 5 (Amended Complaint), filed July 3, 2017.  After completing discovery, on October 3, 2018, Leeper filed this Motion.[1]  In response to the Motion, on November 15, 2018, Wilson filed his Amended Memoranda of Law Opposing Defendant Bill Leeper's Motion for Summary Judgment.  See Doc. 40 (Amended Response).[2]  Accordingly, the matter is ripe for

---

[1] In support of his Motion, Leeper attached a variety of documents.  See Doc. 23-1 (Bass Affidavit); Doc. 23-2 (Bass Investigative Summary); Doc. 23-3 (Car Accident Judgment); Doc. 23-4 (Car Accident Termination of Probation); Doc. 23-5 (Goodman Audio Interview); Doc. 23-6 (Wilson Audio Interview); Doc. 23-7 (First Appearance Notice); Doc. 23-8 (Arson and Burglary Information); Doc. 23-9 (Foster Affidavit); Doc. 23-10 (Wilson Deposition Excerpts).

[2] Wilson initially filed a response on November 9, 2018, see Doc. 35 (Response), to which he attached a

1

review.

## I.  STANDARD OF REVIEW

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[3]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d

---

number of supporting documents.  See Docs. 36-39.  These documents include Wilson's Deposition, see Docs. 36-37 (Wilson Deposition), and Bass' Deposition.  See Doc. 38 (Bass Deposition).  Wilson's Deposition comprises several docket entries.  When citing to or quoting from the deposition, the Court will identify the specific docket number and page within the entry to which the Court is referring.  After filing the materials supporting his Response, and with permission of the Court, Wilson filed his Amended Response.  See Amended Response.  The Amended Response cites to and quotes from the documents Wilson filed with his initial Response.

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.  In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.    BACKGROUND[4]

On July 31, 2013, Wilson was arrested by members of the Nassau County Sheriff's Office and charged with three counts of second degree arson and two counts of burglary

---

[4] The facts recited in this section are either undisputed, or any disagreement has been indicated.  Because this case is before the Court on Leeper's Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Wilson.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008).

of a structure or conveyance.  <u>See</u> Bass Affidavit at 20-21; Arson and Burglary Information at 1.[5]  After appearing in state court, Wilson was detained on a bond of $35,000, <u>see</u> First Appearance Hearing Notice at 1,[6] and went to trial on these charges in May of 2014.  <u>See</u> Bass Deposition at 79.  A jury acquitted him of all charges.  <u>Id.</u> at 80.  Wilson subsequently brought the instant action against Leeper, in his official capacity as Sheriff of the Nassau County Sheriff's Office, alleging federal and state law claims arising from his unlawful arrest and detention.  <u>See</u> Amended Complaint.  The events leading up to Wilson's lawsuit against Leeper are set forth below:

During the Spring of 2013, a series of automobile arsons occurred at the Eastwood Oaks Apartment Complex (Eastwood Oaks), located in Hilliard, Florida.[7]  There were at least three different arson incidents at the apartment complex over a one month period, resulting in fire damage to at least nine vehicles, as well as other arsons and burglaries in the surrounding area during that same time frame.  <u>See</u> Investigative Summary at 2, 3-4, 5.  Joshua Bass, a Property Crimes Detective for the Nassau County Sheriff's Office, investigated the arsons and associated burglaries.  <u>See</u> Bass Deposition at 27, 29, 30.

---

[5] Florida Statutes section 806.01(2) provides that

> [a]ny person who willfully and unlawfully, or while in the commission of any felony, by fire or explosion, damages or causes to be damaged any structure, whether the property of himself or herself or another, under any circumstances not referred to in subsection (1), is guilty of arson in the second degree, which constitutes a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

FLA. STAT. ANN. § 806.01(2).  With respect to burglary, Florida Statutes section 810.02(4) states that

> [b]urglary is a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if, in the course of committing the offense, the offender does not make an assault or battery and is not and does not become armed with a dangerous weapon or explosive, and the offender enters or remains in a:
>
> (a) Structure, and there is not another person in the structure at the time the offender enters or remains; or
>
> (b) Conveyance, and there is not another person in the conveyance at the time the offender enters or remains.

FLA. STAT. ANN. § 810.02(4).

[6] In his deposition, Wilson suggests he was held on a $100,000 bond.  <u>See</u> Wilson Deposition, Doc. 36-3 at 26.  However, he provides no other support for this assertion and the record refutes it.

[7] Hilliard is located in Nassau County, Florida.

In particular, on April 25, Bass was called to Eastwood Oaks to investigate the arson of three different vehicles.  <u>See</u> Investigative Summary at 3.  Then on April 29, another five vehicles suffered fire damage.  <u>Id.</u> at 3-4.  Finally, on May 28, another two vehicles were set on fire, along with some of the stairs at the apartment complex.  <u>Id.</u> at 4.

Throughout his investigation, Bass and his associates were unable to gather any physical or DNA evidence from the crime scenes, and did not discover any evidence specifically indicating how the car fires were started.  <u>See</u> Bass Deposition at 33, 35-36. Bass also was unable to identify any eye-witnesses to the arsons.  <u>Id.</u> at 36-37.  However, Bass did receive numerous tips from Eastwood Oaks residents and others relating to the arsons and suggesting potential suspects for the crimes.  <u>See</u> Bass Investigative Summary at 4, 5, 6, 7, 8, 9-10.  Bass investigated these tips and interviewed any number of individuals, including several potential suspects.  <u>Id.</u>  Nevertheless, after investigation, most of the reported tips did not result in Bass identifying the individual responsible for the arsons.  <u>Id.</u>

Concerned about the ongoing arson threat to its community, Eastwood Oaks management donated $5,000 to the local Crime Stoppers organization in an effort to encourage individuals who might have information regarding the arsons to share that information with authorities.  <u>See</u> Bass Deposition at 40, 58.  Likewise, Crime Stoppers, a "private organization that offers reward money for tips leading to the arrest of criminal suspects," <u>id.</u> at 39, offered a reward of up to $1,000 for any tips related to the arson.  <u>Id.</u> at 40.  Finally, the Florida Advisory Counsel on Arson Prevention also contributed an additional $5,000 to help further the investigation.  <u>Id.</u> at 58.  Therefore, there existed a total reward of up to $11,000 for information about the fires at Eastwood Oaks.  Bass

testified that "[r]ewards for tips leading to an arrest are occasionally offered through private organizations such as Crime Stoppers or the Florida Advisory Council on Arson Prevention. [However, to] the best of my knowledge, these organizations do not receive funding from the Nassau County Sherriff's [sic] Office." Bass Affidavit at ¶ 27. Moreover, Bass stated that while Crime Stoppers worked "hand in hand with law enforcement across the state to provide tips," Bass Deposition at 39-40, including tips to the Nassau County Sheriff's Office, it was not his understanding that the Nassau County Sheriff's Office "offer[ed] rewards for information or tips that [might] lead to an arrest, prosecution, and conviction of a suspect." Id. at 40.

Similarly, Greg Foster, supervising Captain of the Nassau County Sheriff's Office Administrative Services Division, testified "[w]hile certain private organizations such as Crime Stoppers or the Arson Tip Hotline may pass information onto law enforcement agencies, such as the Nassau County Sheriff's Office, the Nassau County Sheriff's Office has no control over those private organizations." Foster Affidavit at ¶ 9. Likewise, he confirmed that the Nassau County Sheriff's Office does not provide any funding to those organizations. Id. at ¶ 8. Foster nonetheless acknowledged that the Nassau County Sheriff's Office does maintain an Investigative Funds Policy to help further narcotics investigations. Id. at ¶ 5-6. The policy allows investigating officers to use funds to cover the costs for narcotics purchases, as well as to encourage otherwise reluctant confidential informants to provide investigators with information. Id. at 4-8. However, Foster testified that the fund was only used to further narcotics investigations, and not arson investigations. Id. at ¶ 6. Moreover, Foster stated that the "Nassau County Sheriff's Office did not offer money for information about the investigation in the Eastwood Oaks

Apartment Complex Arsons." Id. at ¶ 7. Finally, Foster explained that it was "not a custom of [sic] practice of the Nassau County Sheriff's Office to provide witnesses with the contact information of private organizations who may provide financial rewards to individuals with information about unsolved crimes." Id. at ¶ 10.

On June 18, Bass received a phone call from Wendy Goodman, a resident of Eastwood Oaks, reporting that her boyfriend, Wilson, "had told her that he set the first set of vehicle fires at the apartments." Bass Investigative Summary at 7. Goodman further informed Bass that Wilson told her that he used a bag of potato chips to ignite the first vehicle. She also reported that one of the arson victims, Susan Gibson, had been in a traffic accident with Wilson in the prior year, for which Wilson was found at fault. Goodman reported to Bass that Wilson "was upset by this and had a problem with that victim." Id. See also Bass Affidavit at ¶ 11; id. at 21; Bass Deposition at 47, 50.

Wilson and Goodman grew up in the same town and were childhood friends. See Wilson Deposition, Doc. 36-1 at 14, 15. As youths, they had an "on and off" dating relationship, but eventually went their separate ways. Id. at 15-16. Later in their adulthood, Wilson and Goodman reconnected and were a couple. Id. at 16. However, Wilson indicated that Goodman became easily jealous when Wilson spent time with his children, and was jealous of the positive co-parenting relationships he had with the mothers of his children. Id. at 17. In 2011, Goodman accused Wilson of some form of domestic violence, although Wilson denied that he ever hit Goodman or had an altercation with her. See Wilson Deposition, Doc. 36-2 at 14-15. According to Wilson "nothing further" came from Goodman's 2011 allegation of domestic violence against him. Id. at 15-17. Eventually, based on Goodman's escalating jealousy, Wilson sought to end their

relationship, in part by changing his phone number and refusing to communicate with her. See Wilson Deposition, Doc. 36-1 at 17-18.

It is not clear from the record before the Court when Wilson ended his relationship with Goodman.  In Goodman's interactions with the Nassau County Sheriff's Office, she once fleetingly referred to herself as an "ex-girlfriend." See Goodman Audio Interview. However, in Bass' Investigative Summary and Affidavit, where the detective details his interactions with Goodman, he records Goodman referring to Wilson as her "boyfriend." See Bass Investigative Summary at 7; Bass Affidavit at ¶ 11.  In his deposition, Bass refers to Goodman and Wilson as no longer being a couple at the time of the fires.  See Bass Deposition at 54-55.  Wilson was also unable to remember exactly when he ended his relationship with Goodman.  See Wilson Deposition, Doc. 36-1 at 18.  Nonetheless, Wilson believed that Goodman falsely reported to Bass that Wilson started the fires because she was angry he had ended their relationship, rather than for any potential financial reward.  See Wilson Deposition, Doc. 36-2 at 25, 26-27.

On June 19, 2013, the day following Goodman's initial phone call to Bass, the detective went to Eastwood Oaks to interview her in person.  See Bass Investigative Summary at 7; Bass Affidavit at ¶ 13; Bass Deposition at 48.  During his recorded interview with Goodman, Goodman reiterated much of what she related to Bass on the phone.  Goodman stated that about four to five days after the first fire, Wilson told her he had set the fires by lighting a potato chip bag and placing it under Gibson's vehicle. Goodman said that right before the fire, Wilson and Gibson had an altercation, that Wilson was angry and hated Gibson, and that he wanted to bash her car with a bat.  Goodman further reported that she had stayed with Wilson the night of the second set of arsons.

She said that she woke up in the middle of the night and Wilson was not in the apartment. When she awoke later, he was back in the apartment and she saw him looking out the window at the fires. See Goodman Audio Interview.

Goodman said that when she heard from neighbors that other individuals were being identified as potential suspects for the arsons, she had to come forward because the "right people needed to be brought to justice," but that she was not fulfilling any type of vendetta. Id. Goodman also told Bass that Wilson was upset about recently losing his job, and that he had suffered a significant workplace injury for which he was expecting a workers' compensation payment. She reported that he had changed since the injury and "acted kind of crazy." Bass Investigative Summary at 7. She warned Bass that he needed to "move fast" against Wilson because as soon as Wilson received his workers' compensation payment, Wilson was planning to leave town. See Goodman Audio Interview. She also noted that Wilson had already changed his phone number. Id.

Finally, Goodman advised Bass that she had initially attempted to contact Crime Stoppers, but because she was on hold for so long, she called the Nassau County Sheriff's Office directly. Bass advised Goodman that she should call back because Crime Stoppers only pays rewards to individuals who provide tips directly to the organization. Bass also gave Goodman a copy of his card, which included the phone number of the Florida Arson Tip Line on the back, and believes he gave Goodman a separate card from Crime Stoppers. See Bass Deposition at 48-49.

After his interview with Goodman, Bass returned to Eastwood Oaks on two different occasions in an attempt to locate and talk to Wilson. See Bass Investigative Summary at 8; Bass Affidavit at ¶ 19. On both instances, Wilson was not at home, but

Bass left his business card tucked in Wilson's door.  See Wilson Deposition, Doc. 36-2 at 28; id. Doc. 36-4 at 10, 13.  All the while, Bass continued his investigation of the arsons at Eastwood Oaks, interviewing residents and following up on other tips.  See generally Bass Investigative Summary.

On July 11, 2013, after finding Bass' business card tucked into his front door, and hearing from his neighbors that he was a potential suspect for the arsons, Wilson went to the Nassau County Sheriff's Office to talk to Bass.  See Wilson Deposition, Doc. 36-4 at 10.  Wilson stated several times throughout his conversation with Bass that he was hurt and angry to hear from several people that he was a suspect of the arsons.  Therefore, he came to the Sheriff's Office to clear his name.  Additionally, several times in his interview Wilson emphatically denied that he set the fires.  See generally Wilson Audio Interview.

During the interview, Wilson noted that he had suffered a work injury and was expecting a workers' compensation payment.  He told Bass that he was going to use the payment to help pay off his outstanding rent, and then had plans to move elsewhere.  He also acknowledged that, on the night of the second set of fires, the light and noise from the fires woke him, and he walked out of his apartment to see what was happening.  Wilson confirmed that Goodman was with him that night, and Wilson suggested that at that point in time, they were still a couple.  Id.

Throughout the interview with Bass, Wilson brought up the subject of his car accident with Gibson.  On other occasions, Bass raised the subject.  Regardless, Wilson repeatedly denied that he had anything to do with the arson of Gibson's car, but also suspected that Gibson was accusing him of the fires.  He acknowledged that just prior to

the fires, he had completed paying restitution to Gibson for the damage caused to her car from their accident. He noted that the accident had cost him a great deal of money, and that he did not believe he should have been held at fault. He suggested that the officer who responded to the crash was biased in Gibson's favor, complained that Gibson had improperly moved her car before the police arrived at the scene, and even suggested that perhaps she was drunk at the time of the accident. Wilson said he was willing to go back before a judge under oath to clarify what happened. Nonetheless, Wilson emphasized that he had not had any recent interactions with Gibson. Id.

During the interview, Wilson agreed to return to the Sheriff's Office and undergo a Computer Voice Stress Analyzer (C.V.S.A.) test. However, the next day an attorney on behalf of Wilson called Bass to say that Wilson would not take the test if it was administered by a law enforcement officer, fearing bias on the part of the officers. See Bass Investigative Summary at 8. The attorney stated that Wilson would nonetheless be willing to "take a polygraph or C.V.S.A administered by an impartial civilian with the sheriff's office bearing the cost." Id. See also Bass Affidavit at ¶ 21.

Based on the information Wilson provided to Bass during their interview, along with Bass' own further investigation, the detective was able to confirm several aspects of Goodman's earlier statements regarding Wilson. These facts included that Wilson and Gibson had a traffic collision in which the police determined Wilson to be at fault, but that Wilson continued to insist otherwise. Based on Bass' additional search of Nassau County court records, he was able to verify the accident between Wilson and Gibson; that Wilson was found at fault; that Wilson was placed on probation; and that he was ordered to pay restitution. See Car Accident Judgment; Car Accident Termination of Probation.

Additionally, during his interview with Bass, Wilson confirmed that he was present at Eastwood Oaks on the second night of the arsons, and that Goodman was with him that night. Moreover, Wilson confirmed he had suffered an on-the-job injury, was awaiting a workers' compensation payment, and that upon receiving the payment, he intended pay his back rent and then leave the area. Bass also interviewed management officials for Eastwood Oaks who confirmed that Wilson had fallen behind in his rent, had been at risk of being evicted, and had been very stressed lately, sometimes yelling and acting out. See Bass Investigative Summary at 7, 9. Another apartment management representative confirmed that management was working with Wilson to address his debt, and that Wilson had signed a promissory note giving the apartment complex $3,000 of his expected workers' compensation recovery for back rent. Id.

In a follow-up phone call with Goodman on July 15, 2013 – a few days after Bass interviewed Wilson – Goodman informed Bass that Wilson contacted her and said "he had been shown the statement against him. She further advised he told her that he had lied before and that he did not start the fires." Bass Investigative Report at 8-9. Goodman again confirmed her original statements to Bass and said "that she was willing to testify in trial against him." Id. at 9.

In light of the evidence he had gathered thus far, Bass and his investigative colleagues met with Assistant State Attorney Stephen Seigel to review the case. Id. at 9. Seigel requested that Bass contact Goodman and inquire as to whether she would be willing to provide a sworn statement. Id. Goodman agreed to do so, and she met with Bass and Seigel on July 19, 2013, at the Sheriff's Office.

In this second interview, Seigel questioned Goodman under oath, <u>see</u> Bass Deposition at 64, and she consistently reiterated what she had already shared with Bass in her initial telephone call as well as her first recorded interview. Goodman stated Wilson told her that he set fire to Gibson's car and used a potato chip bag to start the fire. "She further advised Mr. Wilson told her he had set additional fires to throw people off from the first vehicle." Bass Investigative Summary at 9; Bass Affidavit at ¶ 22. She confirmed that on the night of the second set of arsons she

> awoke during the night to use the restroom and Mr. Wilson was not present in the apartment. She stated she went back to bed and later awoke again due to the fires outside the building. She advised that at that time Mr. Wilson was standing in his living room looking out at the fires.

Bass Investigative Summary at 9. <u>See also</u> Bass Affidavit at ¶ 21.

After meeting with Goodman, State Attorney Seigel reported to Bass that while he believed there was probable cause to arrest Wilson, "he wanted more information before signing an arrest warrant." Bass Affidavit at ¶ 23. <u>See also</u> Bass Investigative Summary at 9. Despite this, on July 31, 2013, without a warrant, Bass, along with at least five other law enforcement officers, arrested Wilson at his apartment. <u>Id.</u> at 10; Bass Affidavit at ¶ 24. At his initial appearance, the court ordered Wilson be held on a $35,000 bond, <u>see</u> First Appearance Hearing Notice at 1, and he subsequently proceeded to a jury trial on the charges stemming from the arsons which occurred on April 25, which included the arson of Gibson's vehicle. <u>See</u> Arson and Burglary Information at 1; Bass Deposition at 79.

A jury acquitted Wilson of all the charges against him. Bass Deposition at 80. From the time of his arrest through his acquittal by the jury, Wilson was held in custody for nearly ten months. During this time, "no more arson [sic] occurred at the Eastwood

Oaks Apartment Complex."  Bass Affidavit at ¶ 25.  After his acquittal, Wilson filed the instant action against Leeper, in is official capacity as Sheriff of the Nassau County Sheriff's Office, alleging violations of both federal and state law.

In a deposition given in this case, according to Wilson, during his criminal trial, Goodman testified that Bass met her at a local Wal-Mart parking lot and gave her $5,000.  See Wilson Deposition, Doc. 36-3 at 3-4, 24.  Bass has denied having engaged in any such transaction with Goodman.  See Bass Deposition at 68-69.  Wilson also testified that while he was in jail awaiting trial, he received at least two postcards from Goodman stating "you must be punished for your wrongdoings, you are a perpetrator and a manipulator, compulsive and pathological liar," and "you need Jesus, tell the truth." Wilson Deposition, Doc. 36-3 at 8, 10-11.  Wilson reported that neighbors told him that because he had ended his relationship with Goodman, "she [said] she [was] going to put [him] in jail," Wilson Deposition, Doc. 36-2 at 25, and "if [Wilson did not] want to be with [her anymore, she was] just going to make up something and get him put in jail."  Id. at 27.

In Count I of his Amended Complaint in this action, Wilson asserts a claim pursuant to 42. U.S.C. § 1983.  Specifically, he alleges that the

> Nassau County Sheriff's Office, its employees and agents, within the scope of their authority and under the color of state law, knowingly, intentionally and recklessly deprived the Plaintiff of his Constitutional rights and privileges, including the right to be free from unreasonable searches, seizures and detention; and the right to not be deprived of life, liberty, or property, without due process of law, by adopting a policy, or participating in a widespread custom and practice of paying rewards to witnesses for false testimony.

Amended Complaint at ¶ 25.  In Counts II and III, Wilson asserts Florida law false arrest and false imprisonment claims against Leeper, claiming that pursuant to the Nassau

County Sheriff's Office's policy and custom of paying witnesses for false testimony, Wilson was unlawfully arrested and jailed for ten months. Id. at ¶¶ 29, 33.

## III.    ARGUMENTS OF THE PARTIES

In his Motion, Leeper argues he is entitled to summary judgment on all of Wilson's claims because the officers investigating the arsons and burglaries at Eastwood Oaks had probable cause to arrest Wilson. See Motion at 7-8. Leeper contends that because Bass was able to corroborate many of the facts relayed by Goodman in her report of Wilson's alleged confession, Bass was warranted in relying on Goodman's report as a basis for determining he had probable cause to arrest Wilson. Id. at 9-10. Additionally, Leeper contends that even if Bass lacked probable cause to arrest Wilson, the record facts do not support even an inference that the Nassau County Sheriff's Office had a policy or custom of providing rewards to witnesses for false testimony. Id. at 10-12. Accordingly, Leeper contends judgment should be granted in his favor.

In response, Wilson focuses, in large part, on Bass' actions, and contends that a genuine issue of material fact exists as to whether Bass had probable cause to arrest him. See Amended Response at 9-10.[8] In this regard, Wilson contends that "there was no physical evidence, forensic evidence or eye witness testimony connecting Mr. Wilson

---

[8] Wilson actually argues based on an "arguable probable cause" standard. His reliance on that standard is misplaced. The arguable probable cause standard is applied in § 1983 actions against officers in their individual capacities. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010) ("To receive qualified immunity, an officer need not have actual probable cause, only arguable probable cause."); Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) ("Because qualified immunity is the usual rule for government actors sued in their individual capacities, it will shield them unless case law establishes a bright line in a concrete and factually defined context that makes a violation of federal law obvious."); Heggs v. Grant, 73 F.3d 317, 319 n.5 (11th Cir. 1996) ("The qualified immunity defense does not extend to municipalities or to claims against state actors in their official capacities." (citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 165–67 (1993); Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 n. 2 (11th Cir.1994)). In this action, Wilson did not bring an individual capacity claim against Bass. Rather, he brought an official capacity suit against Leeper. Therefore, a qualified immunity arguable probable cause analysis is inappropriate, and the Court will construe Wilson's arguments as addressing the appropriate standard which is probable cause.

to the arson of the automobiles." Id. at 11. Additionally, Wilson argues that Bass should not have relied on Goodman's report that Wilson confessed to her because there were certain aspects of the information she provided to Bass that Bass failed to corroborate, and also that Bass failed to fully investigate whether Goodman had motives to lie about Wilson. Id. at 11-12. Finally, Wilson contends that the record demonstrates a genuine issue of material fact as to whether the Nassau County Sheriff's Office had a general custom and practice "to provide a monetary rewards [sic] to witnesses in exchange for false testimony of the commission of a crime." Id. at 13.

IV.    **DISCUSSION**

    **a.  Section 1983 Claim Against Sheriff Leeper in his Official Capacity**

In his federal claim against Leeper in his official capacity as the Sheriff of Nassau County, Wilson alleges that the Nassau County Sheriff's Office had a policy and custom "to provide a monetary rewards [sic] to witnesses in exchange for false testimony for commission of a crime." Id. Where an officer is sued under 42 U.S.C. § 1983 in his official capacity, the suit is actually a proceeding against the entity the officer represents. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005); see also Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[O]fficial-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985))). Accordingly, Wilson's claim against Leeper in his official capacity as Sheriff of Nassau County is actually a claim against Nassau County. Thus, the Court considers Sheriff Leeper's liability in the context of those cases discussing county and municipal liability under § 1983.

"[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." Brown, 608 F.3d at 733 n.12 (citation omitted); see Section 1983. To state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'" See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted). Here, Wilson asserts a violation of his constitutional Fourth Amendment rights based on his arrest, prosecution and detention which he alleges were based on the alleged false information Goodman provided to Bass.[9]

The assertion of a constitutional violation is merely the first hurdle in a plaintiff's case against a government entity. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig v. Floyd County, Ga., 643 F.3d 1306, 310 (11th Cir. 2011) (quoting Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); see Denno v. Sch. Bd. of Volusia Cty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be held liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier, 402 F.3d at 1116 (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

---

[9] The Fourth Amendment applies to state and local governments pursuant to the Due Process Clause of the Fourteenth Amendment. See Brown, 608 F.3d at 734 n.15.

In <u>Monell</u>, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). Thus, under the directives of <u>Monell</u>, a plaintiff must establish that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." <u>Denno</u>, 218 F.3d at 1276 (citations omitted); <u>see</u> <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating <u>Monell</u> "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of <u>employees</u> of the [government entity], and thereby make clear that [governmental] liability is limited to action <u>for which the [government entity] is actually responsible</u>.'" <u>Grech</u>, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives' by governmental policymakers." <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action

for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

Although in his Amended Complaint Wilson does not specifically identify the policy or custom which he contends led to his unlawful arrest, in the Amended Response Wilson argues that the "promise of a reward to an [sic] revengeful, unreliable witness is the general custom and practice of the Nassau County Sheriff's Office that led to the unlawful arrest and imprisonment of the Plaintiff, Dexter Wilson." Amended Response at 13.[10] He further contends that summary judgment is inappropriate because there "exists a genuine issue of material fact as to whether there was a monetary custom or policy to provide rewards to witnesses in exchange for false testimony of the commission of a crime." Id. The record before the Court however, does not support this contention. Indeed,

---

[10] The Amended Complaint arguably could be construed as alleging that the Nassau County Sheriff's Office had a custom of arresting innocent people without probable cause. However, Wilson is represented by counsel who specifically argued only that the policy or custom that led to the alleged constitutional violation was the payment of monetary rewards to individuals in exchange for false testimony. Thus, the Court limits its consideration to that claim and considers any arguable reliance on a policy or custom of falsely arresting innocent people abandoned by Wilson. Even so, the Court observes that the record is devoid of any information to support the existence of such an official policy or any custom of such arrests.

regardless of whether Bass actually had probable cause to arrest Wilson for the arsons, summary judgment is due to be entered in favor of Leeper because Wilson fails to point to any record evidence supporting even an inference that an established policy or custom of providing monetary rewards to witnesses in exchange for false information existed, much less that such a policy or custom was the moving force behind his arrest.

The Court turns first to the question of whether Bass acted pursuant to an official Nassau County Sheriff's Office policy when, as Wilson asserts, he paid Goodwin $5,000 for false information implicating Wilson in the Eastwood Oaks arsons. Notably, Wilson identifies no official policy and points to no evidence suggesting the existence of a policy sanctioning the intentional payment of reward money for false information. Indeed, he acknowledges not being aware of any other arrest similar to his. Wilson Deposition, Doc. 36-3 at 24. The record reflects that the Nassau County Sheriff's Office does have an official policy governing the offering of money for information about unsolved crimes. However, nothing in the record suggests that the policy is used to obtain false information. Moreover, Wilson points to no evidence suggesting that this policy led to or played any role in his arrest for the arson charges.

Foster, the supervising Captain of the Nassau County Sheriff's Office Administrative Services Division, stated in his affidavit that the Nassau County Sheriff's Office "does have a policy related to the offering of money for information about unsolved crimes." Foster Affidavit at ¶ 5 (referencing the Investigative Funds Policy). However, Foster also stated that the county did not offer reward money for information about arson cases. Id. at ¶ 6. Rather, the policy was used only for "narcotics related investigations." Id. See also Bass Affidavit at ¶ 26 (noting lack of reward policy). Foster averred that the

Nassau County Sheriff's Office did not authorize the offer of any reward money for information about the Eastwood Oaks arsons.  Id. at ¶ 7.  Foster also acknowledged that private organizations such as Crime Stoppers or the Florida Arson Tip Hotline "may offer financial rewards for information that leads to an arrest of a suspect in an unsolved crime." Id. at ¶¶ 8-9; see also Bass Affidavit at ¶ 27 (noting existence of private organizations who offer awards, but without funding from Nassau County Sheriff's Office).  However, as he explained, "none of their funding comes from the Nassau County Sheriff's Office," and the Sheriff's Office does not have any control over those organizations.  Id.

The Nassau County Sheriff's Office's Investigative Funds Policy is in the Court record.  See Foster Affidavit at 4-8.  The policy speaks generally in terms of funds to be used in the "investigation of criminal activity, conducting confidential investigations, and for the purpose of purchasing illegal drugs, stolen property and information," and also states that "[p]ayments may . . . be made to confidential informants whose information is considered valuable in the arrest and prosecution of criminals."  Foster Affidavit at 4.  The specific terms of the policy overwhelmingly and consistently address the "purchase of illegal drugs," "narcotics," and investigations associated with narcotics crimes.  Id. at 4-7. Additionally, the policy directs that "detectives assigned to the Narcotics/Vice Unit shall not withdraw funds in excess of $300.00 in any twenty four hour (24) time period without prior written approval of the unit sergeant, or other unit supervisor."  Id. at 6.  To the extent funds are extended to confidential informants, the policy states that such payments may be appropriate when an investigating officer is otherwise "unable to induce the informant to cooperate . . . ."  Id. at 4.  Finally, the policy provides that

> Investigative Funds provided to a confidential informant shall not exceed
> $40.00 or half of the amount provided for the purchase of the narcotics

(whichever amount is lowest). In the event that a payment of more than the listed amount is deemed necessary for the [confidential informant], prior review and approval is required from the unit sergeant and the division lieutenant or higher authority. The purpose of this section is to insure that the payment of the [confidential informant] is commensurate with the level of participation and cooperation from the informant.

Id. at 6.

Assuming, as Wilson contends, that Bass paid Goodman $5,000 for false information implicating Wilson in the Eastwood Oaks arsons, nothing in the record suggests that such a payment actually came from the Nassau County Sheriff's Office or was authorized under the official Nassau County Sheriff's Office policy. Wilson does not point to any evidence that conflicts with the evidence limiting the applicability and use of the Nassau County Sheriff's Office official Investigative Funds Policy. The record before the Court demonstrates that the policy was used to further narcotics investigations, but not arson investigations. Further, the policy sets limits on the amount of funds that may be paid to an informant, providing that an officer could not withdraw more than $300 within a 24-hour period without prior approval, and that funds to confidential informants should not exceed $40 or half the cost of the purchase of narcotics, whichever is lower.

Given the terms of the county's Investigative Funds Policy, the record before the Court does not support an inference that the official policy authorized the conduct Wilson asserts led to his arrest. First, Foster unequivocally stated that the county itself did not authorize any payment for information related to the Eastwood Oaks arson investigation. Foster Affidavit at ¶ 7. Although Wilson claims that Bass made a payment, he points to no evidence disputing Foster's testimony that the county authorized no such payment. The undisputed evidence reflects that to the extent the policy allowed the payment of funds to confidential informants, the Nassau County Sheriff's Office limited its application

to narcotics investigations. Wilson was the suspect in an arson investigation, not a narcotics investigation. Additionally, Wilson contends that Bass gave Goodman $5,000. See Wilson Deposition, Doc. 36-3 at 3-4, 24. However, the policy limits the amounts of funds that can be provided to informants, and those limits are far below the amount Wilson alleges Goodman received from Bass. Id. Finally, there is nothing in the record to suggest that Goodman was a reluctant confidential informant for the police. It is undisputed that Goodman contacted the Nassau County Sheriff's Office on her own initiative, see Bass Investigative Summary at 7, and that it was only after she provided Bass information regarding Wilson, that Bass gave her the telephone numbers for Crime Stoppers and the Florida Arson Tip Line. See Goodman Audio Interview; Bass Affidavit at ¶ 16; Bass Deposition at 48-51, 61-62. As such, to the extent the Nassau County Sheriff's Office had an official reward policy, the record does not allow for an inference that the policy authorized the conduct Wilson contends caused his arrest – the payment by Bass of $5,000 for false information about an arson investigation.

Nor do the facts before the Court support an inference that the Nassau County Sheriff's Office had an unofficial custom or practice of providing financial rewards to individuals for false testimony. The Court notes that Wilson stated in his deposition that at his criminal trial, Goodman testified she met Bass at a local Wal-Mart and Bass gave her $5,000. However, beyond Wilson's testimony regarding this single event, Wilson identifies no other facts suggesting that the Nassau County Sheriff's Office had such a practice that was "so widespread," "settled and permanent," that it took on the force of law. See Bd. of Cty. Comm'rs of Bryan Cty., Okla., 520 U.S. at 404; Sewell, 117 F.3d at 489. Indeed, in his deposition, Wilson acknowledged he was not aware of any other

cases similar to his in which a witness was allegedly paid by the police to falsely accuse an individual. Wilson Deposition, Doc. 36-3 at 24-25. Nor does he provide the Court with any additional information to support the proposition that the Nassau County Sheriff's Office had a widespread, settled, and permanent practice of paying witnesses for falsehoods. Rather, all Wilson has presented to the Court is one instance in which a witness, Goodman, allegedly received a payment from an officer, Bass, for her testimony.

Certainly, Bass testified that, on his own initiative, he provided Goodman with the Crime Stoppers and Florida Arson Tip Line contact information. See Bass Affidavit at ¶ 16; Bass Deposition at 38-40, 48-51; 61-62. This, however, does little to advance Wilson's claim. Preliminarily, the Court notes that Wilson points to no evidence suggesting that when Bass did so he either knew or had reasons to know the information Goodman gave him was false. Moreover, regardless of Bass' individual actions, Foster stated that "[i]t is not a custom of [sic] practice of the Nassau County Sheriff's Office to provide witnesses with the contact information of private organizations who may provide financial rewards to individuals with information about unsolved crimes." Foster Affidavit at ¶ 10. Wilson points to no evidence that any other officer made a practice of doing so. As such, the record does not allow for an inference that the Nassau County Sheriff's Office had a custom or practice of paying witnesses for false testimony. See Craig, 643 F.3d at 1311 (no municipal liability where inmate pointed to no more than one incident); McDowell, 392 F.3d at 1290-21 (same); Depew v. City of St. Mary's, Georgia, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally random acts or isolated incidents are insufficient to establish a custom or policy.").

Wilson argues that Bass' testimony that "the Nassau County Sheriff's Office worked hand and hand with Crime Stoppers" suggests the existence of a custom of providing reward money for false information. Amended Response at 12-13. The Court is not so persuaded. Bass' actual testimony was as follows:

> Q: Tell me about Crime Stoppers.
> A: They're a private organization that offers reward money for tips leading to the arrest of criminal suspects.
> Q: And where was their office located?
> A: I believe Jacksonville, Florida.
> Q: Now, you stated that it was your understanding that Crime Stoppers was a private organization?
> A: To the best of my knowledge.
> Q: And were there any state of Florida agencies that worked with Crime Stoppers?
> A: I mean they work hand in hand with law enforcement across the state to provide tips.
> Q: And so in 2013 Crime Stoppers worked with the Nassau County Sheriff's Office?
> A: They provided tips they received that were related to Nassau County crimes to Nassau County.
> Q: And what is your understanding of the source of the reward money that's offered for information that may lead to the arrest, prosecution and/or conviction of a suspect?
> A: I know they typically offer up to a $1,000 reward. I do not know their fundraising sources. I do know that private people, businesses, often add donations to increase rewards if it's relevant. Sometimes, you know, big cases, missing people, murder, things like that, they will add. And in this case, the apartment complex donated $5,000 to Crime Stoppers to up their reward to $6,000 because their residents were scared and they wanted help.

Bass Deposition at 39-40. That Crime Stoppers "worked hand in hand with law enforcement across the state to provide tips" does nothing to suggest that either the Nassau County Sheriff's Office or Crime Stoppers had a custom of providing rewards for false information.

Finally, the evidence before the Court does not allow for the inference that, to the extent any such policy or custom did exist, it was the moving force behind any

constitutional violation Wilson may have suffered.  See Monell, 436 U.S. at 693-94; Snow ex rel. Snow, 420 F.3d at 1271.  The record reflects that it was only after Goodman met with Bass and informed him that Wilson had confessed to the arsons, that Bass either provided her with phone numbers to Crime Stoppers and the Florida Arson Tip Line or met her at a Wal-Mart to pay her a sum of money.  See Goodman Audio Interview; Bass Affidavit at ¶ 16; Wilson Deposition, Doc. 36-3 at 23-24; id. Doc. 36-4 at 7; id. at Doc. 37-1 at 22, 24.  Before Bass and Goodman discussed anything associated with Crime Stoppers or that Crime Stoppers might reward Goodman for the information she provided, Goodman had already provided Bass with all the pertinent information accusing Wilson of committing the arsons.  See Goodman Audio Interview.  Goodman then informed Bass that she had tried to call Crime Stoppers, but was unsuccessful, and therefore called the Nassau County Sheriff's Office.  Nothing in the record supports a conclusion that Goodman called the Nassau County Sheriff's Office because she believed she would be paid for false information.  Indeed, Wilson himself asserts that Goodman implicated him in the arsons because he ended their relationship.  Wilson Deposition, Doc. 36-2 at 25-27.  Therefore, even if the Nassau County Sheriff's Office did have a custom or practice of providing rewards to individuals for providing false testimony, the record before the Court does not support an inference that such a policy caused Goodman to provide false information to Bass about Wilson.  Accordingly, the record before the Court does not allow for an inference that, to the extent the County had a custom of paying for false testimony, that custom was the moving force behind any constitutional violation Wilson may have suffered.

In conclusion, even if Bass lacked probable cause to arrest Wilson, no reasonable jury could conclude based on the evidence in this case that the Nassau County Sherriff's Office had an official policy or a custom of rewarding individuals for false testimony, much less that such a policy led to Wilson's unlawful arrest. As such, summary judgment is due to be entered in favor of Leeper, in his official capacity as the Sheriff of Nassau County, on Wilson's § 1983 claim.

### b. Florida Law Claims of False Arrest and False Imprisonment Against Sheriff Leeper in his Official Capacity

Having determined that summary judgment is due to be granted in favor of Leeper as to Wilson's federal claim, the Court next considers whether to continue to exercise supplemental jurisdiction over the remaining state law claims. At the time the instant case was filed, the Court had original jurisdiction over the federal claim, see 28 U.S.C. § 1331, as well as supplemental jurisdiction over Wilson's state law claims, see 42 U.S.C. § 1367(a). See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). However, § 1367(c)(3) gives a court discretion to dismiss or remand to state court claims before it on the basis of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Indeed, the Eleventh Circuit has held that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d

1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185-86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "[W]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350 (citing Gibbs, 383 U.S. at 726-27) (footnote omitted); Gibbs, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney v. Allstate Ins. Co., 370 F.3d 1086,1089 (11th Cir. 2004) (stating that the Eleventh Circuit has

"encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)).  Notably, the Supreme Court's directive in Cohill concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be applied in all but extraordinary cases." Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing Cohill, 484 U.S. at 350 n.7), aff'd, 338 F.3d 1259 (11th Cir. 2003).  Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial.  Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997).

Here, the Court has determined that summary judgment in favor of Leeper is proper with regard to Wilson's federal claim.  Because the federal claim has been dismissed prior to trial, the Court has the authority under § 1367(c) to decline to retain jurisdiction over the remaining state law claims.  See Murphy, 329 F.3d at 1320; Carr, 156 F. Supp. 2d at 1380 (dismissing state law claims without prejudice after finding the defendants to be entitled to qualified immunity as to the federal claims and noting that it is preferable for state courts to "make rulings on issues of state law.").  However, before determining whether to do so, since the statute of limitations for each of Wilson's state law claims is four years, see generally Fla. Stat. § 95.11(3)(o),[11] and the claims arose on July 31, 2013,[12] the Court considers the effect of § 1367's tolling provision on Wilson's

---

[11] With certain exceptions not applicable here, Florida law provides a four year statute of limitations for claims of "assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort...." Fla. Stat. § 95.11(3)(o).

[12] "In Florida, a cause of action for false arrest and false imprisonment accrues on the day of the arrest."

ability to pursue the claims. This provision states:

> The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). Under common law principles of pendent jurisdiction, a district court's dismissal of pendent claims (now referred to as supplemental claims) when the state statute of limitations had expired was considered an abuse of discretion. See Edwards v. Okaloosa Cnty., 5 F.3d 1431,1433 n.1, 1435 (11th Cir. 1993) (holding that it was an abuse of discretion to dismiss pendent state law claims where the state statute of limitations had run during the federal litigation, but noting that if 28 U.S.C. § 1367 were applicable, subsection (d) would toll the Florida statute of limitations, preserving the plaintiff's state law claim). In 1990 Congress enacted 28 U.S.C. § 1367 in which it codified the doctrines of pendant and ancillary jurisdiction under the name supplemental jurisdiction. Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1562 n.3 (11th Cir. 1994). In doing do, Congress included subsection (d) of 28 U.S.C. § 1367 "[t]o prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court." Jinks v. Richland Cnty., S.C., 538 U.S. 456, 459 (2003). Consequently, § 1367(d) tolls the statute of limitations for supplemental state law claims while they are pending in federal court. See Gainor v. Douglas Cnty., Ga., 59 F. Supp. 2d 1259, 1296 (N.D. Ga. 1998) (holding that since § 1367(d) applied, the "plaintiff's state law claims [were not] barred by Georgia's applicable statute of limitations, as the limitation period [was] tolled while [those] claims [were] pending before [that]

---

Hitchmon v. United States, 585 F. Supp. 256, 260 (S.D. Fla. 1984).

[c]ourt"). Upon the filing of this action, the Court exercised supplemental jurisdiction under § 1367(a) over Wilson's state law claims. Thus, § 1367(d) functions to toll the statute of limitations on those claims during the pendency of this action, and Wilson may re-file them in state court if he wishes to do so. See Jinks, 538 U.S. at 463-64 (stating that § 1367(d) provides the "assurance that state-law claims asserted under § 1367(a) will not become time barred while pending in federal court").

Since the Court has determined that Florida's applicable statute of limitations presents no impediment to Wilson's ability to pursue his state law claims in state court, the Court declines to continue to exercise supplemental jurisdiction as to those claims. Upon determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district court] should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience in deciding whether or not to exercise that jurisdiction." Palmer, 22 F.3d at 1569. Here, the Court finds that judicial economy and convenience would not be served by retaining jurisdiction over Wilson's state law claims. The Court has concluded that summary judgment is due to be granted in favor of Leeper on Wilson's federal claim in Count I based on principles of federal law applicable to municipal liability claims. What remains are uniquely state law claims in which the dispositive issues will likely focus on whether Bass had probable cause to arrest Wilson for the Eastwood Oaks fires. These issues, which the Court did not address in granting summary judgment, are best addressed by the state court. When, as here, a plaintiff's federal claims are eliminated prior to trial, district courts are encouraged "to dismiss any remaining state claims." Murphy v. City of Aventura, 383 Fed. Appx. 915, 919 (11th Cir. 2010) (affirming dismissal of state law claims following entry of summary judgment against plaintiff on the

federal employment law claims, and noting that the court, the Eleventh Circuit, encourages district courts to take such action) (citing <u>Raney</u>, 370 F.3d at 1089); <u>see also</u> <u>Cohill</u>, 484 U.S. 343 at 350 n.7, ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").  As such, the Court declines to continue to exercise supplemental jurisdiction over Counts II and III of the Amended Complaint, and these counts are due to be dismissed without prejudice.

Therefore, in light of the foregoing, it is

**ORDERED:**

1. Defendant's Dispositive Motion for Summary Judgment (Doc. 24) is **GRANTED** to the extent that:

   a. Count I is **DISMISSED with prejudice;** and

   b. Counts II – III are **DISMISSED without prejudice**.

2. The final pretrial conference set for June 17, 2019, at 10:00 a.m. is cancelled, and this case is removed from the July 2019 trial term.

3. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Bill Leeper and against Plaintiff Ryan Dexter Wilson as to Count I.

4. The Clerk of the Court is further directed to terminate all pending motions and close the case.

**DONE AND ORDERED** in Jacksonville, Florida this 13th day of June, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record